UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**ANTONIA HARRIS, MARY WALTERS, and MICHAEL POLLARD, Plaintiffs,**

**v.**

**STEVE WYDRA, Defendant.**

**No. 3:06CV352 (WWE)**

**Memorandum of Decision**

______This case concerns alleged violations of the constitutional rights of plaintiffs Antonia Harris, Mary Walters, and Michael Pollard by Milford Police Sergeant Steve Wydra. Specifically, plaintiffs allege violation of their Fourth Amendment rights, and violation of Michael Pollard's Fourteenth Amendment rights to substantive due process and equal protection. Defendant has filed a motion for summary judgment.[1] For the following reasons, the motion for summary judgment will be granted.

**Background**

In support of the motion for summary judgment, defendant has submitted statements of undisputed facts in compliance with Local Rule 56(a)1, exhibits and affidavits. These materials reflect that the following facts are undisputed.

Plaintiff Michael Pollard is an African American male, who worked for Milford Transit. At all times relevant to this action, Mr. Pollard was six feet, three inches tall,

[1]In their complaint, plaintiffs allege that defendant Wydra violated their rights under the equal protection clause of the Fourteenth Amendment. However, plaintiffs' opposition brief advances argument only in support of alleged violation of Mr. Pollard's equal protection and substantive due process rights.

and weighed 180 pounds. He resided with his aunt, plaintiff Mary Walters, and cousin, plaintiff Antonia Harris at 4 Willow Street in Milford, Connecticut.

On the morning of May 5, 2005, Mr. Pollard, who was wearing a baseball cap and sunglasses, left home to look for a second job. He submitted an employment application at Milford Hospital and returned to 4 Willow Street.

On May 5, 2005, the Milford Police Department received a report that the People's Bank located inside of a Stop & Shop had been robbed. Police Officers Steve Staurovsky and Michael McCormack responded to the report.

In an interview with Officer McCormack, bank teller Marissa Spencer reported that she had been approached by a man who presented her with a note, that stated he had a gun and demanded money. She described the suspect as a black male in his twenties who was wearing a black shirt and black baseball cap. This information was broadcast on the Milford Police radio, and it was reported that a male fitting this description was spotted getting out of a taxi on Bridgeport Avenue. Officer McCormack interviewed the individual who had described seeing a man in a black tee shirt, black pants and a black baseball cap who was walking in front of a Nextel store, carrying a Stop & Shop bag out of which cash was spilling.

Officer McCormack returned to People's Bank and received copies of photos of the suspect retrieved from the bank's security camera. He later showed them to Paul Santoli, the taxi driver who had dropped off the suspect at Stop & Shop. Mr. Santoli indicated that the suspect may have been a man known to stay at the Devon Motel.[2]

---

[2]When Officer McCormack showed the pictures to the Devon Motel clerk, the clerk did not recognize the suspect as an individual who had stayed at the motel.

Mr. Santoli reported that he had picked up an individual matching the suspect's description at Milford Hospital and had driven him to Stop & Shop. The individual had requested that Mr. Santoli wait outside while he went into Stop & Shop. He returned five to eight minutes later and asked that he be taken to the Nextel store. When Mr. Santoli dropped the passenger off at the Nextel store, he observed the passenger drop a plastic bag with money falling out of it.

At Stop & Shop, Officer Wydra interviewed Jean Viera, a Stop & Shop deli worker, who had observed a black male exit a taxi by the west entrance. She described the male as 20 to 23 years old, 6'1" tall, wearing a baseball cap, sunglasses and a long black tee shirt.

At Milford Hospital, Officers Steve Staurovsky and Vaughn Dumas interviewed several hospital employees. Two security guards, Brian Jersey and Bryan Petit, viewed the Stop & Shop photograph. They both indicated that they had seen the individual pictured earlier that day. Officer McCormack obtained a notarized statement from Mr. Jersey stating that he believed that the male in the photograph was the same individual who had completed an employment application at the hospital that morning.[3] Mr. Jersey described the man as approximately 6', 3" tall, 20 years old, with a gold hoop earing in his left ear, a black cap and a black tee shirt.

Officer Staurovsky obtained a notarized statement from Mr. Petit stating that he recognized the male in the Stop & Shop photograph as the same man whom he had seen use the telephone at the hospital to call Milford Taxi. A nursing assistant, Kendra

---

[3]The next day, Mr. Jersey told Officer Staurovsky that he had only written what Officer McCormack told him to write.

Brown, also stated that she had observed a male at the hospital who was same as the individual in the Stop & Shop photograph.

Officer Dumas seized the employment application filled out by the individual who had previously submitted an employment application at the hospital. The application listed the name of Michael Pollard, his address, social security number, and his current place of employment. It did not indicate Mr. Pollard's date of birth.

Milford Officer Frank Zavaglia was sent to observe 4 Willow Street. He reported that a Milford Transit school bus pulled up in front of the house. The bus was driven by plaintiff Antonia Harris and carried Donald Fidalgo, a Milford Transit District bus aide, who is an African American male in his twenties. Officer Zavaglia noted that the male on the bus was wearing a baseball cap and could have been the suspect. He followed the bus onto Route 95 South. Officer Art Huggins called for back up.

Captain Christopher Edson responded to the call for back up and pulled the bus over into the breakdown lane. Ms. Harris stopped the vehicle, and a police officer approached the driver-side with his weapon drawn. Ms. Harris complied with the officers' request to exit the bus. Ms. Harris was informed that she was pulled over because the officers had received information about an individual riding in her bus and they suspected that she may have been hijacked. An officer asked her whether she recognized the man in the Stop & Shop photograph. She responded that she did not recognize the individual and that the photograph was of poor quality. The officers also asked Ms. Harris about her cousin, Michael Pollard. She responded that she could not remember what he had been wearing when he left in the morning but that he had driven his mother's car.

Officer Edson determined that Fidalgo, the individual on the bus, was not the suspect.

After approximately fifteen minutes, Ms. Harris was allowed to board the bus and proceed with her route.

Prior to detaining Mr. Pollard, Captain Edson was informed by another Milford Police officer that Mr. Pollard had no criminal history and that his age did not match the description of the suspect. However, the officers agreed that Mr. Pollard might look younger than his age. Captain Edson also observed that Mr. Pollard might be a desperate individual since he had committed a robbery on the same day that he submitted a job application. He decided that use of a SWAT team was not necessary.

Sergeant Wydra called the house at 4 Willow Street and asked that Mr. Pollard exit the house unarmed and with his hands up. Mr. Pollard complied with this request. Mr. Pollard was wearing blue jeans, work boots, and a white and black plaid short-sleeved shirt over a black tee shirt and also a white tee shirt. He also wore an earing in his left ear. Some of the officers had their guns drawn as he left the house. The police handcuffed Mr. Pollard and placed him in the back of a police cruiser.

Sergeant Wydra then telephoned Ms. Walters and requested that she exit the house. He did not request that she exit her house with her hands up. After Ms. Walters exited the house, Sergeant Wydra questioned her about Mr. Pollard. She answered that Mr. Pollard had left the house at about 9 AM driving a black Saturn, and that he normally wears a baseball cap. An officer showed her the picture of the Stop & Shop photograph. Ms. Walters indicated that the quality of picture was “terrible” and that she could not determine the age of the individual.

Sergeant Wydra and Detective Bill Haas interviewed Mr. Pollard while he was seated in the police cruiser. Mr. Pollard explained that he had been looking for a job at Milford Hospital, that he did not take a taxi, and that he was not near the Stop & Shop.

The police called several witnesses to the scene so that they might view Mr. Pollard. The witnesses observed Mr. Pollard from a distance of 50 to 75 feet.

Katie Choromanski, a bank teller who had been present at the robbery, observed Mr. Pollard. She stated that he appeared heavier than the suspect. However, after Mr. Pollard removed his plaid shirt, she indicated that Mr. Pollard was of similar height and build to the suspect, although she could not be 100 percent sure. Ms. Spencer, Mr. Santoli, Mr. Jersey and Dan Kaligan, a witness who had seen the suspect at the Nextel store, observed Mr. Pollard and stated that he did not appear to be the suspect that they had seen earlier that day.

After hearing Mr. Kaligan's observation, Sergeant Wydra advised Mr. Pollard that he was free to leave. Mr. Pollard's detention took approximately two hours.

During Mr. Pollard's detention, several officers entered the house. Ms. Walters had signed a written consent to search form and Mr. Pollard had consented to a search of his room. The police searched only Mr. Pollard's room and found no evidence linking Mr. Pollard to the bank robbery.

After the police had completed their questioning of the residents at 4 Willow Street, a neighbor inquired whether Ms. Walters required assistance and offered to take her to the hospital. Ms. Walters took a Valium pill but declined to go to the hospital.[4]

---

[4]Prior to May 5, 2005, Ms. Walters had suffered from panic attacks.

On May 10, 2005, Officer Wydra returned to Willow Street to question neighbors about Mr. Pollard.

On May 19, 2005, Sergeant Wydra and Detective Riordan returned to 4 Willow Street with a copy of the employment application that Mr. Pollard had submitted at Milford Hospital. Mr. Pollard confirmed that he submitted this application. After this visit, the police had no further contact with any of the plaintiffs.

## DISCUSSION

______A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F. 2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc., 664 F.2d at 351. In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson, 477 U.S. at 255.

If a nonmoving party has failed to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

**Claims of Fourth Amendment Seizure**

Michael Pollard

Mr. Pollard asserts that Sergeant Wydra deprived him of his right to be free from unreasonable seizure under the Fourth Amendment. Defendant does not dispute that Mr. Pollard was seized within the meaning of the Fourth Amendment.[5] Defendant maintains that Mr. Pollard’s seizure was properly based on probable cause.

“What the Fourth Amendment does guarantee is that no person shall be arrested unless there is good reason to believe that he or she has committed a particular crime.” Powe v. City of Chicago, 664 F.2d 639, 648 (7th Cir. 1981). Probable cause to justify an arrest requires “facts and circumstances within the officer’s knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.” Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). In determining whether an officer had probable cause to arrest an individual, a court must consider the events leading up to the arrest, the actual information the officer had at the time of the

---

[5]A seizure occurs when, by means of physical force or show of authority, a police officer detains a person such that a reasonable person would not have believed that he was free to leave. Brown v. City of Oneonta, 221 F.3d 329, 340 (2d Cir. 2000).

arrest, and whether those facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. Maryland v. Pringle, 540 U.S. 366, 371 (2003). "Absent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful." Loria v. Gorman, 306 F.3d 1271, 1288 (2d Cir. 2002). However, an officer may not disregard plainly exculpatory evidence. Kerman v. City of New York, 261 F.3d 229, 235 (2d Cir. 2001). "The burden of establishing probable cause rests with the police, who must establish that there was a quantum of evidence which amounted to more than a rumor or suspicion, or even a strong reason to suspect." Travis v. Village of Dobbs Ferry, 355 F.Supp.2d 740, 748 (S.D.N.Y. 2005).

The undisputed evidence in this instance supports a finding of probable cause. During the investigation, the Milford Police officers, including Officer Wydra, had obtained information that the individual who had likely committed the robbery had been picked up earlier by taxi at Milford Hospital. At least one individual, a security guard, had identified the man pictured in the Stop & Shop security tape photograph as an individual who had submitted an employment application to the hospital, which application listed Mr. Pollard's name. A law enforcement officer has probable cause to arrest if he received information from an eyewitness unless the circumstances raise doubt as to the person's veracity. Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006). In this instance, Officer Wydra knew of no circumstances to doubt the veracity of Security Officer Jersey's statement. In fact, the statements from the other two hospital witnesses that they had also seen the man in the photograph at the hospital appeared to corroborate Jersey's statement. Further, Officer Wydra was not present

when Officer McCormack took Jersey's statement and he did not know that Jersey later stated that he had only written what Officer McCormack told him to write.

The officers did note that Mr. Pollard's age differed from that of the suspect who was described to be in his twenties. However, it was reasonable for the officers to consider that the individual could look younger than his actual age. The information as to Pollard's age and lack of criminal record did not present plainly exculpatory evidence to defeat a finding of probable cause.

Accordingly, Mr. Pollard's arrest was supported by probable cause.

In the alternative, the Court finds that defendant Wydra is shielded by the doctrine of qualified immunity.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

The test for qualified immunity is twofold and must be considered in sequence. The threshold question is whether, taken in the light most favorable to the plaintiff, the facts demonstrate the official's violation of one of the plaintiff's constitutional rights. The next question is whether that constitutional right was clearly established within the specific context of the case. In other words, the court must consider whether the constitutional right was clear enough so that a reasonable officer would understand that his actions would violate that right. Saucier v. Katz, 533 U.S. 194, 201 (2001).

Thus, a qualified immunity defense is established where "(a) the defendant's

action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998).

The doctrine of qualified immunity recognizes that "reasonable mistakes can made as to the legal constraints on particular police conduct." Saucier, 533 U.S. at 205. Qualified immunity applies if the officer's mistake as to what the law requires is reasonable. Id. Qualified immunity does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation. Malley, 475 U.S. at 341. Summary judgment is appropriate when a trier of fact would find that reasonable officers could disagree. Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995).

In this instance, defendant Officer Wydra had at least arguable probable cause that Mr. Pollard was the suspected bank robber.

Additionally, the Court finds that qualified immunity shields defendant Wydra from liability on any claim as to an alleged unreasonableness of manner in which the police secured Mr. Pollard's detention.

The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequence to the individual against the government's interests in effecting the seizure. Graham v. Connor, 490 U.S. 386, 396 (1989). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Terry v. Ohio, 392 U.S. 1, 20-22 (1968).

Plaintiffs suggest that less intrusive alternatives existed such as meeting Mr.

Pollard in his yard or asking questions within the house so that Mr. Pollard would not suffer public humiliation. In this instance, in light of the fact that the police had probable cause to believe that they had the appropriate suspect, reasonable officers could disagree as to whether it was necessary to have Mr. Pollard exit the house and have him remain handcuffed in the back of the police car. Defendant Wydra is entitled to summary judgment on the claim of Fourth Amendment violation.

Antonia Harris

Plaintiffs argue that defendant Wydra is liable for a violation of Antonia Harris' rights because defendants stopped her without reasonable suspicion as required by Terry v. Ohio. Defendant Wydra counters that he was not involved in the stop of Antonia Harris and that no Fourth Amendment violation occurred.

It is undisputed that defendant Wydra was not present at the scene involving Ms. Harris. Accordingly, the Court will grant summary judgment on the basis that defendant Wydra was not involved in any unreasonable seizure of Ms. Harris.

Plaintiffs maintain that defendant Wydra was involved in a civil conspiracy to deprive Ms. Harris of her Fourth Amendment rights. Plaintiffs have adduced no evidence raising an inference that defendant Wydra had made an agreement with the other officers to stop plaintiff Harris without reasonable suspicion.

However, even assuming that Wydra could be held liable for the alleged violation of Harris' Fourth Amendment rights, qualified immunity applies. Investigative stops require officers to have reasonable suspicion supported by articulable facts that a crime is about to be or has been committed. See Terry, 392 U.S. at 30. Police may not detain an individual based on a hunch, but the likelihood of criminal activity need not

rise to the level required for probable cause and falls well short of a preponderance of the evidence standard. United States v. Arvizu, 534 U.S. 266, 274 (2002). The stop must last "no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983).

Here, the Court finds that at least arguable reasonable suspicion exists. The officers knew that Mr. Pollard, who was then the suspect, worked for Milford Transit, and the bus driven by Ms. Harris carried a male who appeared to resemble the suspected bank robber. Reasonable officers could disagree as to whether these facts gave rise to a reasonable suspicion that the passenger on the bus was the suspect.

Plaintiffs maintain that the fifteen minute duration of the stop was unreasonable. However, no evidence indicates that the duration of the stop was objectively unreasonable, and the officers could also reasonably believe that a stop of fifteen minutes to determine the identities of the individuals and that neither individual carried any weapons did not violate Harris' Fourth Amendment rights. Accordingly, summary judgment is appropriate on Harris' claim against Wydra.

Mary Walters

Plaintiffs maintain that defendant Wydra unreasonably seized Ms. Walters in violation of her Fourth Amendment rights. Defendant Wydra counters that Ms. Walters' contact with the police cannot be considered a "seizure" within the meaning of the Fourth Amendment. Defendant Wydra maintains that Ms. Walters voluntarily answered police questions, and that such voluntary cooperation cannot constitute a seizure.

A seizure occurs only where a law enforcement official, by means of physical force or show of authority, has restrained the liberty of a citizen. Florida v. Bostwick,

501 U.S. 429, 434 (1991). Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification and request consent to search his or her property. Muehler v. Mena, 544 U.S. 93, 101 (2005). A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the surrounding circumstances, a reasonable person would have believed that he was not free to leave. United States v. Mendenhall, 446 U.S.544, 554 (1980). The fact that most individuals will respond to police questioning without being told that they are free to leave does not eliminate the consensual nature of the interaction. I.N.S. v. Delgado, 466 U.S. 210, 216 (1984). The Supreme Court has enumerated several factors indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554. When the police take additional steps after an individual refuses to cooperate with questioning, the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure. Delgado, 466 U.S. at 216.

In this instance, the police officers requested Ms. Walters to exit her house to speak with them. She was not ordered to put her hands up or to show that she was not carrying a weapon. As she approached the officers, the police directed her to avoid the police dogs. During her questioning, she was not physically touched or handcuffed, and the police did not draw their weapons. In her deposition, Ms. Walters stated that the police officers had treated her with courtesy. While more than one police officer was present, no evidence raises an inference that the police present took any

threatening force to compel Ms. Walters' compliance. Accordingly, the Court finds that no Fourth Amendment seizure occurred.

In the alternative, the Court finds that defendant Wydra is entitled to qualified immunity since reasonable police officers could disagree as to whether Ms. Walter's questioning constituted a Fourth Amendment seizure. The Court will enter summary judgment in defendant Wydra's favor.

**Equal Protection**

Plaintiffs maintain that defendant Wydra violated plaintiff Pollard's equal protection rights. Defendant submits that no equal protection violation occurred.

The Equal Protection Clause of the Fourteenth Amendment commands that the government treat all persons similarly situated alike. U.S. Const. amend. XIV; see City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). To state a claim for an equal protection violation based on selective treatment or prosecution, a plaintiff must show that 1) he or she was selectively treated with respect to others similarly situated, and 2) such selective treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir.1994). The police may not investigate an individual for a suspected crime solely upon the basis of the individual's race. Brown, 221 F.3d at 337.

Plaintiffs proffer that Mr. Pollard was treated differently than Marissa Spencer, the white female bank teller who later became a suspect. In investigating Ms. Spencer's involvement in the robbery, defendant Wydra visited Ms. Spencer's home and left her a

message to contact him. Subsequently, Ms. Spencer was interviewed by defendant Wydra by telephone, and she was invited down to the police department for further questioning.

The Court must consider whether the similarity between the circumstances of the plaintiff and the comparator give rise to an inference that race was a factor in the different treatment. Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005).

In this instance, the police investigated Mr. Pollard as a potentially armed suspect on the day of the robbery. By contrast, the police suspected that Ms. Spencer had some involvement in the robbery, but not that she was potentially armed and dangerous. Further, the police pursued Mr. Pollard on the legitimate basis of an eyewitness description of an individual who bore resemblance to Mr. Pollard and whom witnesses identified as having been at Milford Hospital on the same morning as Mr. Pollard. Accordingly, the Court finds no inference that race was a factor for the differing treatment of Ms. Spencer to that of Mr. Pollard. Summary judgment will enter on this claim.

**Substantive Due Process Pursuant to Fourteenth Amendment**

Plaintiffs assert a violation of Mr. Pollard's right to substantive due process based on Mr. Pollard's detention on May 5, and the follow-up investigation of Mr. Pollard.

"Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999). Plaintiffs complain that, given the exculpatory evidence available to the police officers, defendant Wydra's detention

of Mr. Pollard and his follow-up investigation was so outrageously arbitrary as to constitute a gross abuse of governmental authority. After the witness identifications failed to support Mr. Pollard's status as the suspect, the police concluded that Mr. Pollard was not likely involved in the bank robbery. In light of the information available to the police, neither the detention of Mr. Pollard on May 5, nor Sergeant Wydra's follow-up investigation of Mr. Pollard gives rise to an inference of outrageous arbitrary abuse of governmental authority. In the alternative, the Court finds that it was objectively reasonable for defendant Wydra to believe that his action did not violate Mr. Pollard's substantive due process rights, and that defendant Wydra is entitled to qualified immunity on any alleged violation of substantive due process.

NonParty Officers

Defendant's brief requests this Court to hold that the non-party officers involved in the investigation of the bank robbery and detention of Mr. Pollard are entitled to qualified immunity. Plaintiffs had previously filed a motion to amend the complaint to add the six additional police defendants. In ruling on this motion for summary judgment as to defendant Wydra, the Court will not determine whether each proposed defendant is entitled to qualified immunity. If plaintiffs believe that any of the six additional defendants may still be held liable after this ruling, a renewed motion to amend may be filed within 30 days of this ruling.

**Conclusion**

For the foregoing reasons, the Motion for Summary Judgment [doc. #34] is GRANTED. If plaintiffs do not file a renewed motion to amend within thirty days of this ruling's filing date, the Court will close this case.

Dated this __28th__ day of December, 2007 at Bridgeport, Connecticut.

___________/s/________________________
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE