**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **MICHAEL POLLARD,** | : | **No. 3:06CV352 (WWE)** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL McCORMACK,** | : | |
| **Defendant.** | : | |

## MEMORANDUM OF DECISION ON DEFENDANT'S

## MOTION FOR SUMMARY JUDGMENT

This case concerns alleged violations of the constitutional rights of plaintiff Michael Pollard by former Milford Police Officer Michael McCormack in connection with the investigation of a recent bank robbery.   The Court has previously issued a ruling on summary judgment in this case, which found no constitutional violations against Pollard by Officer Steve Wydra during the same bank robbery investigation.

Defendant has filed a motion for summary judgment.  For the following reasons, the motion for summary judgment will be granted.

## Background

In support of the motion for summary judgment, defendant has submitted statements of undisputed facts in compliance with Local Rule 56(a)1, exhibits and affidavits that supplement the undisputed facts found by this Court in its prior ruling on summary judgment.  These materials reflect that the following facts are undisputed.

Plaintiff Michael Pollard is an African-American male, who worked for Milford Transit.  At all times relevant to this action, Mr. Pollard was six feet, three inches tall, and weighed 180 pounds.  He resided at 4 Willow Street in Milford, Connecticut.

1

On the morning of May 5, 2005, Mr. Pollard, who was wearing a baseball cap and sunglasses, left home to look for a second job.  He submitted an employment application at Milford Hospital and returned to 4 Willow Street.

On May 5, 2005, the Milford Police Department received a report that the People's Bank located inside of a Stop & Shop had been robbed.  Police Officers Steve Staurovsky and Michael McCormack responded to the report.

In an interview with Officer McCormack, bank teller Marissa Spencer reported that she had been approached by a man who presented her with a note, stating he had a gun and wanted money.  She described the suspect as a black male in his twenties, wearing a black shirt and black baseball cap.  This information was broadcast on the Milford Police radio, and it was reported that a male fitting this description was spotted getting out of a taxi on Bridgeport Avenue.

Officer McCormack showed copies of photos of the suspect retrieved from the bank's security camera to Paul Santoli, the taxi driver who had dropped off the suspect at Stop & Shop.  Mr. Santoli reported that he had picked up an individual matching the suspect's description at Milford Hospital and had driven him to Stop & Shop.  The individual had requested that Mr. Santoli wait outside while he went into Stop & Shop. He returned five- to eight-minutes later and asked that he be taken to the Nextel store. When Mr. Santoli dropped the passenger off at the Nextel store, he observed the passenger drop a plastic bag with money falling out of it.

At Milford Hospital, Officers Staurovsky and Vaughn Dumas interviewed several hospital employees.  Two security guards, Brian Jersey and Bryan Petit, viewed the Stop & Shop photograph.  They both indicated that they had seen the individual

2

pictured earlier that day.  A nursing assistant, Kendra Brown, also stated that she had observed a male at the hospital who appeared to be the same individual as the man pictured in the Stop & Shop photograph.

During his deposition, Mr. Jersey explained that a security-guard-in-training, Daniella Woodford, who was working at the reception desk, reported that she believed the suspect to be the individual who had filled out an employment application.

By 12:35 p.m., Officer Dumas also learned that a hospital volunteer may have seen the robbery suspect earlier that day.  At 12:43 p.m., Officer Dumas spoke to the volunteer on the telephone since she was no longer at the hospital.  The volunteer described the person from whom she had taken an application.  Officer Dumas believed that the volunteer's description of the individual matched that of the suspect.  He then seized the employment application, which listed Michael Pollard as the applicant.  The application did not request a date of birth.  By 12:52 p.m., officers had responded to 4 Willow Street, the address that plaintiff had listed on his employment application.

Officer Staurovsky obtained notarized statements from Mr. Petit and Ms. Brown stating that he recognized the male in the Stop & Shop photograph as the same man whom he had seen use the telephone at the hospital to call Milford Taxi.

Mr. Jersey commenced filling out a signed statement with Officer Staurovsky. However, Officer Staurovsky had to leave after he received an instruction to seize the telephone that the suspect had reportedly used to call a taxi at the hospital.

Officer McCormack arrived at the hospital at 1:43 p.m.   At the hospital, Officer McCormack obtained a notarized statement from Mr. Jersey stating that he believed that the male in the photograph was the same individual who had completed an

3

employment application at the hospital that morning.  In his deposition, Mr. Jersey
explained that he based his statement on information he had received from Ms.
Woodford, but that Officer McCormack did not instruct him to put that information in the
statement.  Mr. Jersey did not tell Officer McCormack that he had not personally
observed the individual who had filled out the employment application.

Based upon the information known to the officers, Milford police detained plaintiff
outside his home.  Witnesses from the bank and hospital observed plaintiff.  After
several of these witnesses, including Mr. Jersey, indicated that plaintiff was not the
suspect, plaintiff was released.

The day after the robbery and detention of plaintiff, Officer Staurovsky returned
to the hospital to obtain further information about the robbery suspect.  At that time, Mr.
Jersey informed Officer Staurovsky that part of the statement he had given was a
mistake.  Mr. Jersey stated that he had written what Officer McCormack had told him to
write.

## DISCUSSION

A motion for summary judgment must be granted if the pleadings, discovery
materials before the court and any affidavits show that there is no genuine issue as to
any material fact and it is clear that the moving party is entitled to judgment as a matter
of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a
reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden is on the moving party to
demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l

4

Group, Inc. v. London Am. Int'l Corp., 664 F. 2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Liberty Lobby, 477 U.S. at 24. The mere of existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him. See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**Claims of Fourth Amendment Seizure**

Plaintiff asserts that Officer McCormack deprived him of his right to be free from unreasonable seizure under the Fourth Amendment to the U.S. Constitution. Defendant maintains that Mr. Pollard's seizure was properly based on probable cause.

"What the Fourth Amendment does guarantee is that no person shall be arrested unless there is good reason to believe that he or she has committed a particular crime." Powe v. City of Chicago, 664 F.2d 639, 648 (7th Cir. 1981). Probable cause to justify

an arrest requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).  In determining whether an officer had probable cause to arrest an individual, a court must consider the events leading up to the arrest, the actual information the officer had at the time of the arrest, and whether those facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.  Maryland v. Pringle, 540 U.S. 366, 371 (2003). "Absent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful." Loria v. Gorman, 306 F.3d 1271, 1288 (2d Cir. 2002).

So long as an officer reasonably relied upon information, probable cause for the arrest exists.  Bernard v. United States, 25 F.3d 98, 103 (2d Cir. 1994).  However, an officer may not disregard plainly exculpatory evidence.  Kerman v. City of New York, 261 F.3d 229, 235 (2d Cir. 2001).  "The burden of establishing probable cause rests with the police, who must establish that there was a quantum of evidence which amounted to more than a rumor or suspicion, or even a strong reason to suspect." Travis v. Village of Dobbs Ferry, 355 F. Supp. 2d 740, 748 (S.D.N.Y. 2005).

Plaintiff argues that Officer McCormack retained exculpatory information, failed to communicate that information and encouraged Mr. Jersey to alter his statement. Plaintiff asserts that Officer McCormack knew that plaintiff's age did not match that of the suspect's description and that plaintiff had no criminal history.  Further, plaintiff maintains that Officer McCormack should have considered the unlikelihood that an

6

individual filling out an employment application listing personal information would then commit a bank robbery.

In its prior ruling relevant to claims against defendant Officer Wydra, this Court held that the undisputed evidence supported a finding of probable cause.  The Court noted that the investigation indicated that the suspect had been picked up earlier by taxi at Milford Hospital, and that a security guard had identified the man pictured in the Stop & Shop security tape photograph as an individual who had submitted an employment application to the hospital.  Further, as this Court ruled in its prior decision, Mr. Pollard's actual age was taken into account by the officers, who considered that the individual could look younger than his actual age.  As this Court noted, the information as to Pollard's age and lack of criminal record did not present plainly exculpatory evidence to defeat a finding of probable cause.

The additional undisputed evidence relevant to Officer McCormack reveals that Officer Dumas had received information earlier than Officer McCormack indicating that the suspect could be the individual who had previously filled out the employment application.  A law enforcement officer has probable cause to arrest if he received information from an eyewitness unless the circumstances raise doubt as to the person's veracity.  Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006); Caldarola v. Calabrese, 298 F.3d 156, 165 (2d Cir. 2002) ("when an average citizen tenders information to the police, police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that might not be case.").  Mr. Jersey stated in his deposition that Officer McCormack did not ask him to misrepresent the truth and that Mr. Jersey did not inform Officer McCormack that he

7

had never personally observed the employment applicant. No evidence indicates that Officer McCormack should have doubted the veracity of Mr. Jersey's statement. Further, Mr. Jersey's statement was not the only evidence that connected plaintiff with the suspect.  In fact, the statement from Mr. Jersey appeared to corroborate information received earlier by Officer Dumas.  Accordingly, plaintiff's arrest was supported by probable cause.

In the alternative, the Court finds that defendant Officer McCormack is shielded by the doctrine of qualified immunity.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The scope of qualified immunity is broad.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

The test for qualified immunity is twofold and must be considered in sequence. The threshold question is whether, taken in the light most favorable to the plaintiff,  the facts demonstrate the official's violation of one of the plaintiff's constitutional rights. The next question is whether that constitutional right was clearly established within the specific context of the case.  In other words, the court must consider whether the constitutional right was clear enough so that a reasonable officer would understand that his actions would violate that right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

Thus, a qualified immunity defense is established where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the

defendant to believe that his action did not violate such law." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998).

The doctrine of qualified immunity recognizes that "reasonable mistakes can made as to the legal constraints on particular police conduct." Saucier, 533 U.S. at 205.  Qualified immunity applies if the officer's mistake as to what the law requires is reasonable.  Id.  Qualified immunity does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation.  Malley, 475 U.S. at 341.  Summary judgment is appropriate when a trier of fact would find that reasonable officers could disagree.  Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995).

In this instance, in the absence of evidence of improper influence over Mr. Jersey or a reason to question his veracity, defendant Officer McCormack was at least arguably reasonable in relying upon Mr. Jersey's statement as supportive of probable cause.

To the extent that plaintiff claims that defendant is liable for the unreasonableness of the manner in which the police secured his detention, the Court finds that qualified immunity shields defendant McCormack from such liability.

The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequence to the individual against the government's interests in effecting the seizure.  Graham v. Connor, 490 U.S. 386, 396 (1989). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Terry v. Ohio, 392 U.S. 1, 20-22 (1968).

Plaintiff suggests that less intrusive alternatives existed such as meeting Mr. Pollard in his yard or asking questions within the house so that Mr. Pollard would not suffer public humiliation.  In this instance, in light of the fact that the police had probable cause to believe that they had the appropriate suspect, reasonable officers could disagree as to whether the police could have taken the less intrusive alternatives suggested by plaintiff.  Defendant McCormack is entitled to summary judgment on the claim of a Fourth Amendment violation.

**Equal Protection**

Plaintiff maintains that Officer McCormack violated his equal protection rights. Defendant submits that no equal protection violation occurred.

The Equal Protection Clause of the Fourteenth Amendment commands that the government treat all persons similarly situated alike. U.S. Const. amend. XIV; see City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  To state a claim for an equal protection violation based on selective treatment or prosecution, a plaintiff must show that (1) he was selectively treated with respect to others similarly situated, and (2) such selective treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir.1994).  The police may not investigate an individual for a suspected crime solely upon the basis of the individual's race.  Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000).

Plaintiff proffers that Mr. Pollard was treated differently than Marissa Spencer, the white female bank teller who later became a suspect.  However, no evidence

10

indicates Officer McCormack's involvement in the investigation of Ms. Spencer. Further, summary judgment is also appropriate for the reasons articulated in this Court's prior ruling.  In that ruling, the Court considered whether the similarity between the circumstances of the plaintiff and the comparator, Ms. Spencer, gave rise to an inference that race was a factor in the different treatment.  Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005).  The Court noted that the police investigations of Ms. Spencer and Mr. Pollard differed.  The police pursued Mr. Pollard as a potentially armed suspect based on eyewitness accounts on the day of the robbery, while the police suspected that Ms. Spencer had some involvement in the robbery, but not that she was potentially armed and dangerous.  Accordingly, Ms. Spencer and Mr. Pollard are not similarly situated so as to raise an inference that race was a factor for the differing treatment of Ms. Spencer to that of Mr. Pollard.  Summary judgment will enter in favor of defendant on this claim.

### Substantive Due Process Pursuant to Fourteenth Amendment

Plaintiff asserts a violation of his right to substantive due process based the excessive use of force, and the continued harassment of plaintiff during the follow-up investigation.

"Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."  Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999).

It is well established that a plaintiff may not rely upon substantive due process where a specific constitutional provision provides redress for the alleged injury. Graham, 490 U.S. at 395 (the generalized notion of substantive due process did not

11

apply where the Fourth Amendment provided specific protections to the claim).   To the extent that plaintiff's substantive due process allegations constitute a Fourth Amendment excessive force claim, the Court will grant summary judgment.

Further, in its prior ruling, this Court held that the detention of Mr. Pollard and the follow-up investigation was not so outrageously arbitrary as to constitute a gross abuse of governmental authority.  The Court finds that no additional evidence relevant to Officer McCormack indicates that the Court should depart from its prior ruling. Accordingly, summary judgment will enter in defendant's favor on plaintiff's substantive due process claim.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment [doc. #62] is GRANTED.   The clerk is instructed to close this case.


Dated this ___12th___ day of May, 2009 at Bridgeport, Connecticut.


_____/s/_____
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE